Good morning everybody. Welcome to the first day of our sitting here in Montgomery. We've got four cases this morning. Judge Choflat and I are pleased to be joined on Zoom by our colleague Judge Ed Karnes, who I think you can see there, we can see here. Ed, can you hear us okay? Yes, I can. Very good. Okay, we're set. All right, so again, four cases this morning. Before we get going, I'll just kind of give you a few rules of the road. Please be assured that we have read your briefs. We've read the underlying record materials, the cases that matter. So in the limited time that you've got before us today, please just get right to the heart of your argument. Don't waste your own time with a bunch of procedural ramp up. We kind of know how we got here. Let's just get after it. And second, I think most of you will understand sort of our traffic light system. There's a clock here that will count down. You'll see a yellow light when your time is waning and a red light when your time is up. Don't feel like you've got to stop mid-syllable. I won't cut you off. There's no trap door into which you will disappear. But do begin to wind up your presentation when you see the red light. It may be that we carry you beyond the allotted time. Don't of my colleagues would say you're on our time, not yours. And we'll give you your full rebuttal if that happens. So with that, we'll call the first case, which is United States of America versus Donald Watkins. We have Mr. Englehart and Ms. Mazur here for the appellants and Mr. Billingsley here for the appellate. And Mr. Englehart, will you be going first? I will, Your Honor. Very well. Okay. You may proceed when ready. I'm sorry. One logistical matter. Sure. My understanding is that Ms. Mazur can defer this. If she does not use all her time, she's going to be dealing with what she doesn't use to make for my part of the argument. Okay. So, but you're going first, correct? And you're starting with eight minutes. Correct. Am I understanding correctly that if you're going to speak for eight, then she'll speak for five. But if she doesn't use all of her time, she'll stand back up? I'll add it to my rebuttal. He'll just add it. Let's do that. Yeah, that'll be better. Okay, great. Perfect. You may proceed. Good morning. My argument goes in basically in three parts. There's a series of issues of insufficient evidence of intent to harm that applies to all of the wire fraud charges. There is an argument relating to insufficient evidence of conspiracy, primarily the lack of intent on the part of Mr. Wilkins Jr., senior's co-defendant, to address an agreement to commit an illegal act. Specifically that he, that Wilkins Jr. lacked the intent, specific intent to commit wire fraud. And because it takes to detangle with conspiracy, regardless of what evidence of intent there is for Watkins Sr., there could be no conspiracy conviction as to either. The third bucket relates to evidentiary issues relating to restriction of evidence related in two categories primarily. One is rebutting evidence put on by the government relating to elements of the case or relating directly to both defendants defense as to lack of intent to harm, which is applicable to both the wiring and bank fraud cases. And also restriction or exclusion of evidence relating to collateral matters that would tend to undercut either the government's proof or support the Judge Boudry's failure to instruct regarding, failure to give the requested instruction regarding intent to harm as to both the wire and bank fraud charges. Defendant's instruction was complete. The court's instruction was not complete. Defendant's instruction was a correct statement of law. The other instructions given by the court did not cover the, did not cover the gist of the intent to harm charge that was. So if we're going to kind of get into the instructions now as it seems like we are, I mean, but you don't, you don't deny that she used the pattern instructions, right? Correct. And you say she didn't, that the instructions didn't cover the gist. I mean, didn't she say that they, you know, she did say that there had to be, to act with the intent to defraud means to act knowingly and with a specific intent to use false and fraudulent pretenses, representations, or promises to cause loss or injury, right? So there is, there does have to be an intent to injure in her instruction, right? Correct. But the problem with that was that it did not identify, it did not define what is meant by, I keep getting echo on this mic, it does not define what is meant by loss or injury, intent to cause loss or injury, and does not define the difference between intent to deceive, which is insufficient by itself to constitute an intent to defraud, and an intent to do harm, which is a distinction that was the opinion. Well, I thought that her instruction specifically said proving intent to deceive alone without the intent to cause loss or injury is not sufficient to prove intent to defraud. She did. That sounds like pretty clearly distinguishing between intent to deceive and intent to injure. It doesn't define what intent to cause injury or loss constitute, what constitutes intent to cause injury or loss. It doesn't define what satisfies that. It also doesn't define what the difference is between intent to deceive and intent to cause loss or injury or intent to cause harm, however you want to characterize it. It distinguishes them, but it doesn't tell how you distinguish them. It doesn't tell what the definition of each of them is. And in our particular instance, that was a critical distinction. In fact, we argued, we essentially conceded in brief that there was sufficient evidence to show from which a jury could conclude intent to deceive as to each of the charges, at least as to Dworkin Sr., but that there was not sufficient evidence of intent to harm to sustain the case. And because of the sufficiency of the evidence on the first part, but the insufficiency of the evidence on the second part, it raised the specter and it raised the very serious problem of convicting based on intent to harm. We argued that various representations that really only went to inducement to enter into the transactions was sufficient to constitute intent to cause injury or loss, because of the failure to distinguish. He obviously, I think, unspeakably intended to get the money from the victims, and he intended to use it on personal expenses. I mean, the email establishes that, among other evidence. And so he's getting the money by false representations, and he intends to spend it and did spend it on other matters than he represented. If that's not intent to harm, what is? Well, that doesn't address the consideration that was actually exchanged. It does not address what each of the investors actually received. And they didn't receive what they argued for. That's undisputed. They argued for receiving an investment in the company or an infusion of cash into the company that would make their ownership interest more valuable. Let me ask you this. You go to the bank, and you tell the bank, you've got a business here, and you want to make it a better business. You want to be on the And that's what you're going to spend the money for, and you're going to put details on how hip your business is, and how it's energy efficient, and so forth and so on. And it's going to improve the business. They give you the money, and you go to Vegas and gamble it all away, which is what you intended to do, gamble. Now, are you telling me that's just an intent to deceive and not an intent to harm? Well, it's unclear to me what the consideration that they were expecting to receive was in that exchange. It's clear. When you get money, and you tell somebody you're going to invest it in the business, they expect you to invest it in the business and make the business better, which is to their benefit. And when you go to Vegas and gamble it away, or when you spend over $50,000 on your American Express personal debt, that's harming the person who gave you the money to advance that person's interest in the business. As an initial matter, I would say that that goes only to the inducement. It only goes to the intended to deceive. But as a follow-up, let me mention that there are two different... Excuse me, counsel. How do you, in my hypothetical, how do you ever harm a bank when you falsely inform the bank of the intended use of the money that you borrowed? Give me an example that would show intent to harm. If there's clearly no intent to repay at the time that the transaction is made, would be one example. Because otherwise, if the... You can gamble away the money in Vegas after assuring the bank in writing and signing a document that says you're going to use it on the business. You can go above and all in Vegas and that's not fraud. It's not intent to show, intent to cause harm because in that instance, presumably, the borrower would be receiving a, would be signing a promissory note, signing some sort of a loan document where they would pay either periodically or pay X amount at a specified time or specified times. Your position then is as long as you sign a promissory note, you can make whatever representations you want to make about the use of that money and that's not intent to defraud. It's not intent to harm, no sir. As long as the person has the ability and the intent to repay, that would not be intent to harm. If the person intends at the time that they make the transaction to repay in accordance with the terms that the bank bargained for, regardless of whether the bank would have entered into the transaction otherwise, I would say no, that's not intent to harm and I think that follows directly from the reasoning in the Takaloff case and in the Waters case. But I understand your position. Okay. Thank you very much. We've carried you well over. You'll have your full rebuttal. Ms. Mazur, I'm sorry for mispronouncing your name earlier. You're up. Your honors, may it please the court. This court should reverse the district court's denial of Watkins Jr.'s motion for judgment of acquittal for two reasons. First, the government failed to prove guilty knowledge on behalf of Donald Watkins Jr. And second, the government failed to prove the aiding and abetting element of count two of the indictment. Your honors, if you go to a bank and you tell the bank you want to buy a Ford truck to improve the business, but you go to Vegas and spend the money instead, then you have the case that was charged against Donald Watkins Sr. However, in this case, the sins of the father are not the sins of the son. They are if the son tells the father how to pull it off. It says, get this money from Mr. Watkins Jr. But don't tell him that. Tell him it's going to be for the two business deals. Yes, your honor. And if that was the evidence presented in this case, I would agree. However, in this case, that's the email. Is it not? Junior telling Sr. how to pull it off, wasn't it? Your honor, if this court was to apply what the government did and what the lower court did, and start with the assumption that Donald Watkins Jr. was in fact guilty of this crime, then that would certainly be what the email would infer. You have to start with the assumption, counsel. What you have to start with the assumption is that Donald Watkins Jr. wrote the email because he never denied sending the email. And then you say, this is what Donald Watkins Jr. told Sr. to do. It's the email. It's his own word. Respectfully, your honor, relying on United States versus Brown, the Fifth Circuit case that we added yesterday afternoon. In that case, the court recognizes that we must start with the presumption that Donald Watkins Jr. is innocent. And then the government must prove- Counsel, first year law school, platitudes are not going to get you anywhere because we're not back with a clean slate. We have a record full of evidence. And the smoking gun is Junior's email. Part of the case is Junior's email sent. Certainly, your honor. This is how we're going to get money out of them. And then we'll spend it on something different on what you tell them we're going to spend it on. Your honor, respectfully, the email that we're referring to, that April of 2012 email, the date that it was sent is critical to this case because the transaction at issue, the transaction in which Donald Jr. was convicted happened 14 months later. That initial email was in no way related to the transaction that Donald Sr. participated in 14 months later. In fact, the email that Donald Jr., the transaction that Donald Jr. was referencing in that April 2012 email, the email that the government considers their smoking gun was related to the NABIRM deal that happened in May of 2012. So now nearly one year later, the government and the lower court want to somehow bootstrap that smoking gun email and somehow say that that was evidence of Donald Jr.'s intent to conspire with his father in a transaction that occurred 14 months later. Your honor, It was when you concede counsel evidence of his intent to commit exactly the same crime that was committed later. Was it not? In other words, he said, here's how we vote it off. Government goes to the business deals and we'll clear up these personal debts that we've got and use it for a purpose other than what you're asserting, which is precisely what happened. Why? Your honor, to get to that though, and this is the really critical issue in this case that the court will have to consider, is setting the precedent of whether being copied on an email, merely copied and nothing else, infers the requisite knowledge of the fact that the defendant knows misrepresentations are occurring. See, nowhere in that 2012 email does Donald get this money from victim A. And I believe, your honor, that the jury agreed when they acquitted Mr. Watkins in count three and four of the indictment that also dealt with that same victim. See, the problem here for the government is the fact that on May 24th of 2013, that would go to count three of the indictment, the jury acquitted Watkins Jr. On May 25th, that communication, dealing again with victim A, the jury again acquitted Donald Jr. Then the jury jumps to May 28th and convicts Donald Jr. in count two, but yet we're supposed to believe that the jury somehow used the email from 2012, 14 months earlier, to convict on count two, but quit on counts three and four. It's inconsistent. And the reason it's inconsistent is in order to get there, in order to have sufficient evidence to convict on count one and count two, your honors, the government would have to have proved that Donald Watkins Jr. had knowledge of the misrepresentations contained in his father's emails. That requires, and I'm sorry, your honors, I see that my time has expired. Okay, finish your thought, finish your thought. It requires this court to say that that knowledge can be imputed. The knowledge that misrepresentations are being made can be imputed merely because you're copied on an email. Because if we take away the fact that Donald Jr. was copied on the emails, if we take that away, take that out of the equation, then there is zero evidence that was presented by the government to establish that Donald Watkins Jr. knew his father was making those misrepresentations on May 24th and May 25th for the transaction on May 28th. Yes, your honor. You can always say, take out this evidence and that evidence and that evidence, all the evidence against my client, and there is no evidence against my client. That doesn't help us at all. The jury saw what the evidence was, and that is evidence against your client. There's no evidence he did not say the emails, and he was copied on the emails, and there's evidence of email exchanges other than that between father and son. Certainly, your honor, and that's why the question before this court today is one of, can the government infer the necessary knowledge to prove the elements of counts one and two of the indictment by saying you knew of the misrepresentations because you were copied on the email? Because that is what the government said, that is what the district court said. And the question becomes, did a single witness take the stand in the entire trial and testify that Donald Watkins Jr. opened those emails that he was copied on, read those emails that he was copied on, participated in the creation of those emails that I submit to this court that not one single witness testified that Donald Watkins Jr. knew about the contents of the emails that he was cc'd on. It's merely an inference, a huge inferential leap by the government that because he was copied on the emails, he must have had the knowledge, and that simply could not be the law of this circuit. If so, any of us could be copied at any moment in time on an email, and that makes us a part of a conspiracy to commit a crime, and that simply cannot be the law. And it is for those reasons that we ask this court to reverse the district court's finding and grant the judgment of approval. Okay, very well. Thank you very much. Mr. Billingsley, let's hear from you. Good morning. May it please the Court. Michael Billingsley for the United States. The evidence in this case was overwhelming as to each of the defendants with their respective convictions. Let me just make one real brief point going to Jr. since that was the last thing that we heard. Judge Carnes, you referenced one of the emails the district court relied on in rejecting the claim. The other one was for a $150,000 loan. Senior asked Jr. to prepare that loan in an email, I mean, prepare a promissory note for that loan in the email. And in the same email, he says, this is what we're going to spend the money on. It's a lot of personal expenses. He prepares a promissory note. The promissory note includes the statement that it should be used from the business purposes only. That we would submit is also sufficient. I'm prepared to try to answer any questions that the Court may have, but we're satisfied with the sufficiency claim to rest on our briefs. Can I ask you one, this may be a wire fraud remedial question. There's all this debate in the briefs about, well, that goes to an intent to deceive, but not an intent to injure for the statute. It seems to suggest, it says that, you know, whoever having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by false pretenses, why is it that intent to defraud is an element of a wire fraud claim? Maybe I'm just misunderstanding the statute, but it sounds like there's this disjunction and you can either prove an intent to defraud, which would be an intent to harm, or you can prove a scheme or artifice to obtain money or property by false pretenses. Well, I think that there, I guess there's some overlap, obviously, Your Honor. And I don't know, I'm not sure that I have a good answer to your question. It's not something I've thought a lot about. I would say in this case, the debate sort of centers around the tackle-off decision and some of the language in that. But in this case, I think what Judge Carnes pointed out, intent to harm doesn't mean that you're, I mean, if we could look into Watkins Sr.'s mind and know he had every intent that this business was going to blow up and everybody was going to get super wealthy, it wouldn't change the fact that when he represented, we've got this great opportunity, I need financing to make sure this opportunity goes through, and those things were false, that he harmed the defendant, I mean, the victims by taking their money and using it for a purpose other than what they intended. Yeah, I don't think, I don't really think I have any real quarrel with the government's position that there is intent to defraud, intent to harm here, given the nature of the deception about the very purpose of the loan and the ability to repay. Seems like it qualifies under tackle-off to me. I was just curious as an antecedent matter, if it's in fact the case that you have to show intent to defraud slash intent to harm, or instead whether there's this alternative path under the wire fraud statute that allows you to prove intent to deceive by means of false pretenses alone. Yeah, I understand your question, Your Honor, and I'm just, it's not something that I'm, I'm happy to, if you wanted us to brief it or something. No, no, no, I think it's really more a point of curiosity for purposes of this case. I don't think it much matters. I just wanted to know if I was sort of fundamentally misunderstanding the statute. Okay, thank you. For the instruction, I'll just make one brief point that's not, I mean, I think the tackle-off case itself was unique facts, and I think it recognizes sometimes unique facts may be a more specific instruction. I think Waters recognizes this as well that sometimes a defense presented may warrant a particular type of instruction. Just one other thing, I don't, I think the instructions were more than fine in this case, but one thing I would just point out because it's not in the brief is that his defense, as instructed to the jury by his request, was that he made no misrepresentations, that he didn't misrepresent anything. Good faith defense, that he was entitled to do what he did, so it wasn't like tackle-off where they're saying, we acknowledge, we didn't disclose this financial relationship with the B-Girls, but that's not enough. There was no argument like that, that I acknowledge I misrepresented this, but that's not enough. When the instruction in this case, out of the circuit's instructions, they were, and again, that's what my impression was. They were. They were the pattern jury instructions. Yes. Correct, your honor, and we think they were more than sufficient. There's no error in the instructions. It sounds to me like you're making two arguments. One has to go to the sufficiency of the evidence, period, to withstand a motive for judgment, and the other is an erroneous instruction. That's how I heard the argument. That's right. They have the sufficiency of the evidence arguments, and then they also say that the instruction was insufficient because it didn't. The court didn't give their requested instructions on intent to harm, but as Judge Newsom pointed out, the court clearly said intent to deceive is not enough, and I think that's what tackle-off stands for. You have to have more than that. The last point I'd make real briefly as to the restriction of evidence, we note in our brief that the examples they give, they don't, they're without merit, and I would just, you know, I'm of course going to review the record, but if you look at the defense case, his witnesses, and his own testimony, the court gave Watkins Sr. a lot of leeway in presenting the defense. We think more than the court was required to do. Again, I'm respectful of your time, and we'll rest on our briefs. We just ask that the court affirm the judgment below. Thank you. Very well. Thank you, Mr. Billingsley. Mr. Ingleheart, you've got two minutes remaining. So time to triage. I've been stanching and bleeding the whole time, Your Honor. Let me focus on, I'll focus on the evidence relating to conspiracy and also the evidence relating to the May 2013 $150,000 loan that I believe Judge Carnes in particular was referring to. With respect to the email, the April 2012 email that Ms. Mazur was talking about and Judge Carnes referred to, what Junior did was not tell Sr. how to defraud Barclay. What Junior did was identify a number of bills that needed to be paid, identified potential priority debt payments. He suggested a way to get them, but he did not suggest or indicate in any way that Sr. should lie about how Sr. was going to go about raising that money. There's no evidence that Junior had any input into what Sr. represented to Mr. Barclay. There's no evidence that Junior told Sr. what to say. There is no evidence that Junior had any responsibility for whatever deceptive representations Sr. may have made. The key point here is that what Junior did was consistent, entirely consistent with what he thought he was doing, which was acting consistent with his role as the administrative day-to-day manager of the business. It was an equally, it was a reasonable, obvious, equally plausible hypothesis that was consistent with innocence. It was an innocent explanation and to attribute intent to harm or intent to defraud from that. Is it your argument that Sr. couldn't be convicted of the conspiracy because Junior was not the conspirator? Correct. So he's just acting alone. So he couldn't have been conspiring with anybody? Correct. Because Junior was the only conspirator, the only co-conspirator that the government had. And if Junior was the co-conspirator, that cancels out count one? Correct. Correct. Okay, very well. Thank you all. That case is submitted.